**The ByrneLaw Office**
John P. Byrne, SBN 134412
A Professional Corporation
Sherin Hackman, SBN 223612
20969 Ventura Blvd., Suite 230
Woodland Hills, California  91364-2378
Ph. (818) 593-5520
Fax (818) 593-5522
John.Byrne@byrnelaw.biz
Attorneys for Debtor Susan Eyre Lange

# UNITED STATES BANKRUPTCY COURT

## CENTRAL DISTRICT OF CALIFORNIA

| | |
|---|---|
| In re SUSAN EYRE LANGE,<br><br>     Debtor. | Case No.:  2:bk-11-35090 BB<br><br>Chapter 7<br><br>**DEBTOR'S OPPOSITION TO MOTION FOR RELIEF FROM STAY**<br><br>Date:  June 21, 2011<br>Time:  10:00 a.m.<br>Ctrm:  1475 |

**TO THE HONORABLE UNITED STATES BANKRUPTCY JUDGE, SHERI BLUEBOND, AND TO THE MOVING PARTY:**

Susan Eyre Lange ("Debtor") hereby opposes the Motion for Relief from Automatic Stay ("Motion") of Seaside Capital Fund I, LP ("Movant").

///

///

///

///

///

1

# TABLE OF CONTENTS

I.      BACKGROUND TO THIS CASE. ................................................................3

II.     BACKGROUND TO THE RESIDENCE. ......................................................3

III.    BACKGROUND TO THE LOANS THAT ENCUMBERED THE RESIDENCE. ....3

    A.    WAMU Deceptively Induced Debtor to Refinance with a Disastrous
        Adjustable Note.  For example, the Monthly Payment More than Doubled in
        Two Years, but the Note Carried a Three-Year Prepayment Penalty. ............4

    B.    After the Lender Recorded a Notice of Default, the Debtor Entered a Written
        Agreement to Pay Over $6,000 Per Month to Stop the Foreclosure.  Debtor
        Made Every Single Payment. ......................................................................5

    C.    In Breach of the Agreement, the Lender, Without Notice, Foreclosed,
        Apparently on the Alleged Ground that Debtor Did Not Return Two Phone
        Calls. .........................................................................................................6

IV.     BACKGROUND TO THE MOVANT.  THE MOVANT IS A TENANT IN COMMON
      THAT ACQUIRED THE RESIDENCE AT A FORECLOSURE SALE.  THE
      PRINCIPAL OF MOVANT'S FIFTY-PERCENT PARTNER WAS AN
      EXECUTIVE AT THE BANK THAT ILLEGALLY FORECLOSED ON THE
      RESIDENCE. ................................................................................................6

V.      THE COURT SHOULD DENY THE MOTION. ...............................................7

    A.    The Attorney Declaration is Insufficient. ......................................................8

    B.    Failure to Provide Notice to Trustee. ............................................................9

    C.    The Alleged Grounds for the Motion do Not Exist. ........................................9

    D.    Despite Knowledge of the Automatic Stay, Movant Appeared in State Court
        and Obtained an Order on a Trial Date and Gave Notice that Plaintiff was
        Amending its Complaint to Seek More Damages. .......................................10

VI.     CONCLUSION. ..........................................................................................10

Opposition to Motion for Relief From Automatic Stay

## MEMORANDUM OF POINTS AND AUTHORITIES

Before the Court is a Debtor that has paid over $6,000 per month for the past 20 months for her occupancy of 276 Running Ridge Trail, Ojai, CA 93023, her residence of the past 13 years (the "Residence").  Debtor is current under the payments for the Residence.  Movant is an investor/speculator that seeks to evict Debtor and deprive the estate of valuable assets.  Debtor requests the Court to deny the Motion, which is supported entirely by a mere attorney declaration; alternatively to calendar the Motion and allow adequate time for the Debtor to present, and the Court to consider, the numerous issues involved in this Motion.

## I.  BACKGROUND TO THIS CASE.

On June 10, 2011, Debtor commenced a case under Title 11, United States Code, Chapter 7, by filing a voluntary petition.  John Menchaca is the designated Chapter 7 Trustee, but he has no notice of this Motion.

## II.  BACKGROUND TO THE RESIDENCE.

Debtor, and her husband, acquired the Residence in 1998 for cash.  After the purchase, Debtor invested hundreds of thousands in home improvements.  As noted above, Debtor has paid over $6,000 per month for her occupancy of the Residence since July 2009.

## III. BACKGROUND TO THE LOANS THAT ENCUMBERED THE RESIDENCE.

In constructing the home improvements, Debtor obtained financing in 2004 on more or less conventional mortgage loan terms.

///

///

///

3

**A. WAMU Deceptively Induced Debtor to Refinance with a Disastrous Adjustable Note.  For example, the Monthly Payment More than Doubled in <u>Two</u> Years, but the Note Carried a <u>Three</u>-Year Prepayment Penalty.**

In late 2006, however, WAMU's unlicensed loan broker approached Debtor to re-finance.  Representations were made that the prospective loans were "better" for the Debtor, but the new loan was an Adjustable Rate Mortgage ("ARM").  In truth, the ARM loan was much better for WAMU, who securitized and sold the ARM loan, and the broker, who collected handsome fees to churn the loan.  But for the Debtor, the ARM was a ticking time-bomb and a financial disaster.  For example, the Subject Mortgage contained a <u>three</u>-year prepayment penalty, but (as Debtor would learn) payments that more than doubled in just <u>two</u> years.   Though Debtor's income remained at expected levels, in two short years, the ARM features of the ARM loan triggered an alarming increase in the Debtor's monthly mortgage.  Debtor was unprepared because WAMU had represented to Debtor that the payments on the ARM loan would not increase for five years.

While the Debtor raised these concerns and disputes with WAMU, WAMU turned predatory.  When WAMU told Debtor that the papers she signed governed the bank's actions, Debtor sought modification of the loan.  From all appearances, WAMU, then its successor Chase Bank ("Chase"), never engaged in bona fide negotiations towards modification.

In 2009, while Debtor believed that modification was being seriously considered, Chase/WAMU began state law private foreclosure.  Chase/WAMU, however, never recorded an assignment or other instrument that allegedly conveyed to it the rights under the subject deed of trust.  Chase just steamrolled forward, and, in the interim, raised Debtor's monthly obligation dramatically.

///

4

**B. After the Lender Recorded a Notice of Default, the Debtor Entered a Written Agreement to Pay Over $6,000 Per Month to Stop the Foreclosure. Debtor Made Every Single Payment.**

In May, 2009, Chase recorded a Notice of Default ("NOD"), not notarized and not signed under penalty of perjury, by and through an "agent" whose name appears nowhere in any loan documents.  That NOD was rescinded and a new NOD was issued by a "substituted trustee" under the subject Deed of Trust.  The substituted trustee, however, was not substituted "ín" by a recorded Substitution until weeks after the substituted trustee had already issued the NOD.  Nor did the NOD comply with California *Civil Code* §2923.5 which requires an affidavit or declaration of the efforts of the lender to prevent foreclosure before filing a Notice of Default.  Nonetheless, Chase/WAMU proceeded to notice a foreclosure sale based on the invalid NOD.

Debtor desperately retained attorneys to assist her.  Debtor negotiated and entered a Trial Plan Agreement ("TPA") with WAMU whereby Debtor would pay a monthly payment of $6,384 and WAMU would suspend the foreclosure proceedings only to be resumed in the event that Debtor breached the TPA.  A true and correct copy of the TPA is attached hereto as Exhibit "7."  Thereafter, as required by the TPA, WAMU suspended the NOD and Trustee's Sale.  In September 2009, Debtor signed the TPA and began making her payments.

Debtor timely made all payments required under the executed TPA and had and continues to have the ability to make payments as due. In reliance on WAMU'S suspension of the NOD and the Notice of Trustee's Sale, Debtor spent thousands of dollars to repair and modify Running Ridge.

As of July 2010, Debtor had made, and WAMU had accepted, approximately 9 consecutive payments under the TPA.

5

**C. In Breach of the Agreement, the Lender, Without Notice, Foreclosed, Apparently on the Alleged Ground that Debtor Did Not Return Two Phone Calls.**

Without having set, announced or noticed a new sale date, and without having notified Debtor or her attorney of the sale's date, time and location, CHASE (unknown to Debtor) purported to hold a trustee's sale on July 14, 2010, exactly one year from the first date set for sale.[1]

On July 15, 2010, Debtor came home to find a three day notice to quit on my door. According to CHASE, it claimed it foreclosed because it had attempted to reach Debtor on her home telephone number to discuss loan modification but received a recorded message that my phone number was disconnected or no longer in service. Debtor's phone was not then nor has it been disconnected or out of service. CHASE's representative said that since CHASE could not reach me, CHASE decided to put the Residence up for sale on July 14, 2009, only six days later with no notice to Debtor and without proper notice to the public.

Debtor has appropriately sued WAMU/Chase and others for breach of contract and has recorded a Lis Pendens.

**IV. BACKGROUND TO THE MOVANT. THE MOVANT IS A TENANT IN COMMON THAT ACQUIRED THE RESIDENCE AT A FORECLOSURE SALE. THE PRINCIPAL OF MOVANT'S FIFTY-PERCENT PARTNER WAS AN EXECUTIVE AT THE BANK THAT ILLEGALLY FORECLOSED ON THE RESIDENCE.**

The purchaser at the defective foreclosure sale was Defendants Alta Community Investment III, LLC ("Alta") and Seaside Capital Fund 1, LP ("Seaside") as 50% tenants in common. The principal of Alta was an executive with WAMU. Because the

---

[1] Under California law, a lender must re-start the entire foreclosure process unless it brings its Deed of Trust to a foreclosure sale within 12 months of the original sale date. It appears that Chase chose to ignore the TPA in order to preserve its original foreclosure schedule.

Opposition to Motion for Relief From Automatic Stay

foreclosure sale was, among other things, defective, and a breach of contract, the title alleged by Movant is/was "void."

## V. THE COURT SHOULD DENY THE MOTION.

A motion for relief from stay is a contested matter under the Bankruptcy Code. See Fed. R. Bankr.P. 4001(a); 9014(c). Bankruptcy Rule 7017 applies in contested matters. Rule 7017 incorporates Federal Rule of Civil Procedure 17(a)(1) which requires that "[a]n action must be prosecuted in the name of the real party in interest." See also, In re Jacobson, 402 B.R. 359, 365-66 (Bankr.W.D.Wash.2009); In re Hwang, 396 B.R. 757, 766-67 (Bankr.C.D.Cal.2008).

Movant is not a qualified real party in interest because the foreclosure sale that led to its alleged status as purchaser was defective.  The Court should permit the Debtor to raise these defenses in a regularly noticed contested hearing. A court determining a relief from stay motion should consider defenses that "strike at the very heart of the validity of movant's secured claim by barring any recovery on the debt or any lien enforcement." *In re Souders* (BC ED PA 1987) 75 BR 427, 432 (overruled on other grounds in *FRG, Inc. v. Manley* (3rd Cir. 1990) 919 F2d 850, 856)]  Discovery should be permitted. [See FRBP 9014.]

At the same time, it appears that Debtor will have difficulty raising these defenses at the unlawful detainer trial.  Movant's Exhibit "C" appears to be a garden variety unlawful detainer cause.  Issues of title ordinarily cannot be raised in unlawful detainers and, if raised in the tenant's answer, are subject to motion to strike. *High v. Cavanaugh* (1962) 205 CA2d 495, 498–499.

///

///

///

7

## A.  The Attorney Declaration is Insufficient.

The Federal Rules of Evidence (FRE) apply to all proceedings in bankruptcy court. [See FRE 101; FRBP 9017].  Evidence on motions for relief from stay, as with all other kinds of motions, must be presented by declarations or affidavits, signed under penalty of perjury and filed and served on the opposing party. [FRBP 9017 (incorporating FRCP 43).

The Motion is supported by a mere attorney declaration. *See In re Delaney–Morin* (9th Cir. BAP 2003) 304 BR 365, 369–370 (attorney's "avowals" of debtor's default did not constitute evidence justifying relief from stay).  As suggested in March, Ahart *California Practice Guide – Bankruptcy* (Rutter 2010) § 8:1641.1:  "Attorneys should avoid signing declarations in support of stay relief motions unless the motion involves multiple bankruptcy filings by the debtor . . . ."

In addition, the attorney declarant admits that he is a "limited custodian" and that his knowledge comes from documents "supplied me by the owner" (hearsay).

Significantly, Movant alleges that "Movant acquired title to the premises by foreclosure sale prepetition and recorded the deed with the period provided by state law for perfection." [Motion, ¶ 2.]  The attorney declaration, however, fails to present competent evidence on this issue because the attorney does not have personal knowledge or lay a proper foundation.  The attorney declarant cannot properly authenticate Exhibit "A."

Finally, the declaration is confusing because it seems to assert that Debtor has paid "0.00" in rent, when Debtor has been paying over $6,000 per month for over 20 months. [Declaration, ¶ 5 b.]  That seems like an important fact to omit, especially considering over $66,000 is supposed to be on deposit at the attorney's trust account.

## B. Failure to Provide Notice to Trustee.

Debtor has made thousands of dollars in payments in the preference periods.  In addition, Debtor asserts that the deed of trust that encumbered her Residence is "void ab initio" because the ARM Loan was procured through fraud.  On that note, Debtor has state law litigation proceeding in which she asserts a right to the Residence free of the fraudulent ARM Loan encumbrances.  Debtor has a Lis Pendens recorded.  The Residence and the associated interests in the litigation are property of the estate.

Movant has failed to notice the Trustee.  If a "motion is only addressed to the debtor, the stay will only be lifted to proceed against the debtor and property of the debtor, not against property of the bankruptcy estate.  Thus, movants seeking complete relief must name and serve both the debtor and the trustee, asking that the stay be lifted as to both the estate and the debtor/debtor's property." March, Ahart *California Practice Guide – Bankruptcy* (Rutter 2010).

## C. The Alleged Grounds for the Motion do Not Exist.

The Debtor's right to continued occupancy of the Premises comes from the following:  Her title to the Residence; Her compliance with the TPA agreement; Chase/WAMU's breach of the TPA agreement; Chase/WAMU's defective and void foreclosure sale; Debtor's continued payment of over $6,000 per month for over 20 months.

Movant alleges that acquired title through the void foreclosure sale.  As noted above, Movant fails to submit admissible evidence on the subject.

The attorney declarant contends that Debtor has not filed a certification under 11 U.S.C. § 362(l)(1) or deposited a "monetary default" under 11 U.S.C. § 362(l)(2).

9

However, (a) there is no monetary default and (b) neither section applies because there is no pre-petition judgment. *See* reference therein to 11 U.S.C. § 362 (b)(22).  Finally, there is no evidence of a "monetary default."

**D. Despite Knowledge of the Automatic Stay, Movant Appeared in State Court and Obtained an Order on a Trial Date and Gave Notice that Plaintiff was Amending its Complaint to Seek More Damages.**

On June 17, 2011, with knowledge of the Automatic Stay, Movant nevertheless appeared in state court and obtained an order and a Notice of Trial that will expedite the suit against the Debtor.

In addition, Movant has proceeded against Debtor's spouse despite the fact that its alleged claim is a "community" claim and aims to obtain relief against community property.  In violation of the Automatic Stay, Movant filed papers in the State Court stating its right to amend its complaint to change its request for "less than $10,000" to a claim for damages exceeding $100,000.

**VI. CONCLUSION.**

For the foregoing reasons, the Court should deny the Motion.

Dated:  June 20, 2011                    **The ByrneLaw Office**
                                         A Professional Corporation


                                         _____
                                         John P. Byrne
                                         Attorneys for Debtor

Opposition to Motion for Relief From Automatic Stay

1

2

## DECLARATION OF SUSAN EYRE LANGE

3     I, Susan Eyre Lange, declare:

4

5     1.  I am the Debtor in the above case and the rightful owner and occupant of that

6  certain real property commonly known as 276 Running Ridge Trail, Ojai, CA 93023, my

7  residence of the past 13 years.   As such, I make this declaration from personal

8  knowledge.  If called as a witness, I could testify to the truth of the following facts.

9

10    2.  I purchased my home at 276 Running Ridge Trail; Ojai, CA 93023 ("My

11 Home") in 1998, for cash and have lived there with my husband, Dr. Julian Lange ever

12 since.  Over the next twelve years, we spent an enormous amount of money, time and

13 energy making My Home a truly unique, toxic free environment because I have several

14 environmental allergies and as an example of a "Green Home" for my husband's and

15 my domestic and international clients.

16

17    3.  I have two tenants, Mr. Hutner and Ms. Stoyanova.  Mr. Hutner has lived

18 there since 2006.  Ms. Stoyanova has lived there since 2009.  My husband and I rented

19 the rooms to Mr. Hutner and Ms. Stoyanova because we wanted people in our home

20 since we spend so much time in Santa Monica, California where our medical practice is

21 located and we have a condominium which is presently being rented.

22

23    4.  I am a Doctor of Oriental Medicine having trained and practiced for thirty (30)

24 years in China, England and the United States. My practice is located at 506 Santa

25 Monica Blvd., Ste. 227; Santa Monica, CA 90401.

26

27

28

Opposition to Motion for Relief From Automatic Stay

5. Movant herein filed an unlawful detainer suit in Ventura County, Case No. 56-2010-00377850-CL-UD-VTA to evict me, my husband and my tenants from My Home. To stay that unlawful detainer action, the Superior Court of the State of California for the County of Ventura required me to pay over to Movant's attorney, $6,000 per month for him to maintain in his attorney-client trust account pending the outcome of the civil case I filed against Movant and others.  I have timely made every payment such that Movant's attorney has $66,000 of my money in his trust account.  The Superior Court has not released that money.  I believe that the $66,000 is part of the bankruptcy estate and should be at the disposal of the Trustee as part of my bankruptcy in addition to my claims against Movant; its partner, Alta Community Investment III, LLC ("ALTA"); J.P. Morgan Chase Bank, N.A. ("CHASE"); Quality Loan Service Corp. ("QUALITY"); LSI Title Company ("LSI"); California Reconveyance Corporation ("CRC"); Building Capital, Inc. ("BUILDING CAPITAL"); Jeff Dunavant ("DUNAVANT"), Washington Mutual, Inc. (with WASHINGTON MUTUAL BANK F.A., WASHINGTON MUTUAL ASSET ACCEPTANCE CORP. and WASHINGTON MUTUAL MORTGAGE SECURITIES CORP. "WAMU") and others.

6. In 2004, JEFF DUNAVANT ("DUNAVANT"), an employee of BUILDING CAPITAL, INC. ("BUILDING CAPITAL"), approached to get me to obtain a mortgage on My Home from WAMU in the amount of $995,000 (the "Original Mortgage") and a Home Equity Line of Credit ("HELOC") from Countrywide in the amount of $195,000 (the "HELOC").  Trusting DUNAVANT completely, I did so.

7. I am informed and believe that in or around 2006, WAMU approached BUILDING CAPITAL and DUNAVANT requesting that they get it as many mortgages as possible even though (as I later learned) Dunavant had a restricted license and was on probation with the State of California.  Had I known of the status of his license, I would

12

not have obtained any loan through him.  Adjustable Rate Mortgages ("ARMS")

especially Negatively Amortized ARMS ("NA-ARMS") were particularly desired since

they were significantly more profitable for WAMU than other ARMS or Fixed Rate

Mortgages ("FRMS").  I am informed and believe that BUILDING CAPITAL and

DUNAVANT received larger fees for selling NA-ARMS instead of other ARMS, FRMS or

Home Equity Lines of Credit ("HELOCS") for the same reason.  I am informed and

believe that WAMU presold thousands of mortgages to sellers of Secondary Vehicles

(the beginning of the "Securitization" process) requiring it to use whatever means

necessary to obtain the mortgages they had already sold.  I am informed and believe

that WAMU, BUILDING CAPITAL and DUNAVANT made a practice of convincing

unsuspecting mortgagees to misrepresent income and other underwriting factors on

loan applications as well as changing borrowers' application documents after signature

in order to obtain the mortgages WAMU had already sold.

8. Building Capital and Dunavant approached me to refinance the Original

Mortgage and the HELOC.  BUILDING CAPITAL and DUNAVANT on the one hand and

I on the other hand formed a contract by which I granted BUILDING CAPITAL and

DUNAVANT the right to represent me in attempting to obtain refinancing of the Original

Mortgage and the HELOC with loans better for me.  BUILDING CAPITAL and

DUNAVANT would receive any fees or bonuses associated with obtaining refinancing if

they were able to do so.  I would only refinance if I could obtain a loan or loans that

would leave me in a better situation than I was with the Original Loan and the HELOC.

9. I am informed and believe that DUNAVANT and BUILDING CAPITAL

knowingly misrepresented the Subject Loan to me and convinced me that I should

refinance the Original Mortgage with an NA-ARM which despite DUNAVANT'S

representations, contained more predatory terms than the first loan.  For example, the

1  Subject Mortgage contained a three year prepayment penalty and payments that more

2  than doubled in approximately two years.  When I asked about the terms, DUNAVANT

3  and BUILDING CAPITAL told me that the new loans were a much better deal for me,

4  not to worry about what I thought it said, that I would keep the same great rate for the

5  first five years of the Subject Loan.  I didn't understand their explanation but I trusted

6  BUILDING CAPITAL and DUNAVANT and took their word for it, to my now obvious

7  detriment.  BUILDING CAPITAL and DUNAVANT convinced me to refinance with a

8  more predatory NA-ARM with a three year prepayment penalty because, unbeknownst

9  and not disclosed to me, WAMU paid them significantly more for doing so.  I requested

10 that my Original HELOC be replaced with another HELOC if a second mortgage was

11 needed so I would have flexibility as to how much to borrow against it, if any.  Instead

12 BUILDING CAPITAL and DUNAVANT obtained an FRM for me, from National City

13 Bank telling me that it was better than a HELOC.  In fact, BUILDING CAPITAL and

14 DUNAVANT obtained the FRM instead of a HELOC because they received a

15 significantly larger fee for doing so.  I didn't understand but took on faith that

16 DUNAVANT and BUILDING CAPITAL were telling the truth and would protect me.

17 They weren't and they didn't.

18

19    10.  The NA-ARM Subject Mortgage became unaffordable for me in two years.

20 WAMU, BUILDING CAPITAL and DUNAVANT failed to provide accurate, material

21 disclosures concerning the Subject Mortgage.  Had I known them, I would not have

22 entered into the Subject Mortgage.

23

24    11.    I paid the Subject Loan timely through July 2008.

25

26    12.    In July 2008, I received a surprise notice from WAMU that my $4200 per

27 month mortgage payments would more than double the next month to more than

28

Opposition to Motion for Relief From Automatic Stay

$9,000.  Because my mortgage payments had already risen from approximately $3500 per month to $4200 per month, I had already been trying to modify the Subject Loan through my initial counsel, then later, through the Law Offices of Julie Gaviria ("Gaviria").  Gaviria dealt with WAMU initially, then CHASE when it purportedly purchased the promissory note on the Subject Mortgage (the "Subject Note") which was secured by a Deed of Trust (the "Subject DOT").  Gaviria notified CHASE that she represented me in December 2008.  Gaviria attempted to work out a modification of the Subject Mortgage with CHASE.

13. On the DOT, I am named as the Trustor; WAMU is falsely identified as the lender and beneficiary; and CRC is named as the Trustee.  The true facts are that WAMU gave up all beneficial interest in the Subject Note when it presold the note.

14.  Since the subject mortgage was taken out, no assignment of the Note or DOT has been recorded giving CHASE any interest in the Property nor was a document recorded making CHASE the Beneficiary, servicer or agent of the beneficiary of the DOT.  Accordingly, since CHASE had no capacity to make them, all actions taken by CHASE in regard to the Property were void on their face.  Even if such a transfer had taken place or been recorded, CHASE could not have taken that which WAMU did not possess, status as the holder in due course of the Subject Note which it had already sold.

15. Pertinent documents recorded with the Ventura County Recorder regarding are as follows.  Transfers between and among my husband and me, and our trust (the Health Core Consulting Common Law Pure Trust (the "Health Core Trust") are excluded.

15

16. The Subject DOT was recorded on April 24, 2006.  A true and correct copy of the Subject DOT is attached hereto as Exhibit 1

17. QUALITY caused A Notice of Default and Election to Sell under Deed of Trust ("First NOD") to be recorded on March 18, 2009.  A true and correct copy of the First NOD is attached hereto as Exhibit 2.  The document itself is dated March 14, 2009 and purportedly executed by "Quality Loan Service Corp., AS AGENT FOR BENEFICIARY BY LSI Title Company, as Agent" with two illegible initials and without any name identifying the signer or his or her capacity.  At the time, QUALITY was not even purportedly an entity related to the Subject DOT.  The First NOD was not signed under penalty of perjury nor was it notarized nor, I am informed and believe did it state the language statutorily required to allow an unsworn declaration.  I am informed and believe that the First NOD was signed by a "robosigner" who had no idea what was being signed or the true facts relating to the subject mortgage.  For all these reasons, the First NOD is void on its face.

18.  A second Notice of Default and Election to Sell under Deed of Trust was recorded on March 20, 2009 (the "Second NOD").  A true and correct copy of the Second NOD is attached hereto as Exhibit 3.  The document itself was dated March 18, 2009 and again was purportedly executed by "Quality Loan Service Corp. AS AGENT FOR BENEFICIARY BY LSI Title Company, as Agent", again with two illegible initials and without any name or capacity identifying the signer.  Again, the document was not signed under penalty of perjury nor notarized nor did it state the language I am told and believe is statutorily required to allow an unsworn declaration.  I am informed and believe that the Second NOD was also signed by a "robosigner" who had no idea what was being signed and accordingly is void on its face.  Again, neither QUALITY nor LSI

16

was in any way related to the Subject DOT when the Second NOD was executed and recorded.

19. A Rescission of Notice of Default and Election to Sell Under Deed of Trust (of the First NOD) (the "Rescission") was recorded on March 25, 2009. A true and correct copy of the Rescission is attached hereto as Exhibit 4. The document was purportedly executed on March 18, 2009 by "Quality Loan Service Corp. AS AGENT FOR BENEFICIARY BY LSI Title Company, as Agent". A signature appears on the "By:" line with what appears to be a stamped name, "RUBI NGO" although no capacity is stated. Again, at this time, neither QUALITY nor LSI had any capacity to record any documents against the Subject DOT.

20. An invalid Substitution of Trustee was recorded on May 4, 2009 and dated on March 18, 2009 (the "Substitution of Trustee"). A true and correct copy of the Substitution of Trustee is attached hereto as Exhibit 5 and incorporated herein as if set forth in full. The Notarization on the Substitution of Trustee states that Christine Anderson, the Attorney in Fact for JP Morgan Chase Bank, National Association executed the document before the Notary on March 26, 2009. The notarization was not legally completed and is invalid making the Substitution of Trustee invalid. What's more, I am informed and believe that the NOD was signed by a "robosigner" who had no idea what was being signed or the facts surrounding my case and for this independent and additional reason is illegal. What's more, I am informed and believe that the Second NOD was not signed in the presence of the notary, thereby independently making the notarization invalid. Additionally, I am informed and believe that the Notary signed the document as a robosigner, Ms. Anderson not being present before the notary at the time of notarization. Accordingly and independently of the

---

other reasons above, the notarization was invalid and making the Second NOD void on its face.

21.  The Substitution of Trustee identifies CHASE as the present beneficiary of the Subject DOT yet contrary to California law, no document had or has been recorded with the Ventura County Recorder's Office transferring status as beneficiary to CHASE. CHASE has not and cannot prove that it was the beneficiary of the DOT as stated in the Substitution of Trustee.  Accordingly, the Substitution of Trustee is void on its face.

22.  Further, CHASE has not and I am informed and believe cannot prove that it was the servicer for the true beneficiaries of the promissory note on the Mortgage.  For that independent reason, the Substitution of Trustee is void on its face.

23.  Under California law, a later recorded Substitution of Trustee is valid in regard to a prior recorded Notice of Default only if it is executed no later than the time the Notice of Default is executed.  Here, even though the Substitution of Trustee is dated March 18, 2009, the date on which the Second NOD was purportedly executed, based on the notarization, the Substitution of Trustee was not executed until March 26, eight days after the Second NOD was purportedly executed and six days after the Second NOD was recorded.  For this independent reason, like the first NOD, the second NOD is void on its face and unenforceable.

24.  Further, the Second NOD is void in that it doesn't meet the requirements of California Civil Code §2923.5 which requires that an affidavit or declaration of the efforts of the lender to prevent foreclosure before filing a Notice of Default be attached to the NOD.  The Second NOD is purportedly signed by a company, on behalf of another company on behalf of another company none of whom is represented by a

person.  No such declaration is attached.  Even if such a declaration were attached, a company cannot sign a declaration in California, only a person can.  The execution on the Second NOD appears to consist of the same two letters that executed the First NOD although the initials appear to be written by different people in each case.  Further, the "signature" of the anonymous signer is not notarized independently rendering the Second NOD void on its face.

25. A Notice of Trustee's Sale (the "NTS") was recorded on June 26, 2009 and set the date for the trustee's sale as July 14, 2009.  A true and correct copy of the NTS is attached hereto as Exhibit 6.  The NTS is invalid since it was recorded without a valid NOD.  Accordingly, the purported trustee's sale of My Home based upon the NTS is void.  Prior to July 14, 2009, CHASE agreed to and did postpone the July 14, 2009 Trustee's Sale.

26. Ms. Gaviria negotiated a Trial Plan Agreement ("TPA") with WAMU whereby I would pay a monthly trial payment of $6,384 for three months and WAMU would suspend the foreclosure proceedings only to be resumed in the event that I reached the TPA.  A true and correct copy of the TPA is attached hereto as Exhibit 7.  In mid September 2009, WAMU sent the TPA to me.  I signed it and returned it to WAMU on September 25, 2009.  Thereafter, as required by the TPA, WAMU suspended the NOD and Trustee's Sale.

27. I timely made all payments required under the executed TPA and continued to make the payments through July, 2010 ten (10) months later.  At all times herein, I had and continue to have the ability to make those payments as due.  In reliance on WAMU'S suspension of the Second NOD and the Notice of Trustee's Sale, I spent thousands of dollars to repair and modify My Home.

19

28.   I am informed and believe that once the TPA was executed, WAMU set no new date for a Trustee's Sale of My home.  I am informed and believe that none was announced orally at the date, time and place of the last previous, or original, trustee's sale set for My Home.  Further, I am informed and believe that no date, time or location was noticed in a newspaper or posted at the site of a new Trustee's Sale as required by California law.  I believed that CHASE would honor the TPA and suspend the foreclosure of My Home until there was further negotiation with me.  CHASE did not.

29.   CHASE illegally foreclosed on My Home in breach of its agreement with me. CHASE breached the contract they had with me not to foreclose on my home.

30.   Without having set, announced or noticed a new sale date, and without having notified me or my attorney of the sale's date, time and location so I could have bid on My Home, CHASE (unknown to me) purported to hold a trustee's sale of My Home on July 14, 2010, exactly one year from the first date set for sale.  If CHASE had waited even one more day, it would have had to begin the foreclosure process anew.  I am informed and believe that CHASE cut corners with the law in order to avoid having to start the foreclosure process from the beginning.

31.   On July 15, 2010, I came home to find a three day notice to quit on my door. I am informed and believe that a staff member in my then attorney's office spoke with a CHASE representative immediately thereafter.  After checking computer notes in my file, the CHASE representative told the member of my attorney's office staff that on July 6 and July 8, 2010, another CHASE representative, a Ms. Atkins had attempted to reach me on my home telephone number to discuss loan modification but that she received a recorded message that my phone number was disconnected or no longer in service.  My phone was not then nor has it been disconnected or out of service.  I am

20

informed and believe that the CHASE representative told the staff member in my

attorney's office that since CHASE could not reach me, CHASE decided to put My

Home up for sale on July 14, 2009, only six days later with no notice to me and without

proper notice to the public.  For that additional reason, the sale was void.

32.  After the illegal sale, Quality prepared and caused a Trustee's Deed Upon

Sale ("TD"), purportedly transferring title to My Home to ALTA and SEASIDE as 50%

Tenants in Common.

33.  Todd Kaufman ("KAUFMAN") is a principal of Movant Alta Community

Investment III, LLC ("ALTA").  During the time periods relevant to my disastrous WAMU

ARM Loan, KAUFMAN ran the entire securitization division for WAMU.

34.  ALTA and Seaside Capital Fund 1, LP ("SEASIDE") purport to have

purchased my home and the property at trustee's sale in 50% equal shares.

35.  I am informed and believe that KAUFMAN is the president and owner of

ALTA COMMUNITY INVESTMENT INC. ("ACII"), a company in the business of buying

properties in foreclosure and at Trustee's Sales. I am informed and believe that ACII is

the sole member of ALTA.  Both entities are owned and controlled by KAUFMAN.

36.  I am informed and believe based on internet web sites originating from

KAUFMAN or his agents that in 1998, KAUFMAN founded and operated the Alta

Residential Mortgage Trust ("ARMT") which was primarily geared to buying mortgages

and mortgage backed securities.  KAUFMAN was so successful that in 2000, WAMU

purchased ARMT and Kaufman became an employee of WAMU.  There he started and

led WAMU's Correspondent Lending Division which ultimately became WAMU's largest

Opposition to Motion for Relief From Automatic Stay

channel of mortgage loans.  Extremely pleased with his knowledge and work product,
WAMU asked KAUFMAN to develop and operate WAMU's own securitization division,
which he did.  In 2001, he cofounded Washington Mutual Capital Corp. ("WMCC")
which became one of the largest distributors of mortgage backed securities on Wall
Street.  KAUFMAN ran WMCC for many years, including the time in which the Subject
Mortgage was funded.  I am informed and believe that the Subject Mortgage was
securitized by WMCC during Kaufman's control of WMCC.

37.   I believe that it was specifically to hide KAUFMAN'S insider relationship that
the unlawful detainer action underlying the instant motion was brought SOLELY in
SEASIDE'S name even though SEASIDE is only the purported 50% owner of My Home
with KAUFMAN'S ALTA.  Movant here and KAUFMAN knew that as an insider, it would
be more difficult if not impossible to pretend that he and his partner were bona fide
purchasers of My Home and therefore statutorily entitled to certain presumptions in
regard to the Trustee's Deed after Sale.

///
///
///
///
///
///
///
///
///
///
///
///

22

1    I declare under penalty of perjury under the laws of the United States of America

2    that the foregoing is true and correct.

3    Executed on June 20, 2011, at ___OJAi___, California.

4

5    _Susan Lange_

6    Susan Lange

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

Opposition to Motion for Relief From Automatic Stay

**NOTE:** When using this form to indicate service of a proposed order, **DO NOT** list any person or entity in Category I. Proposed orders do not generate an NEF because only orders that have been entered are placed on the CM/ECF docket.

# PROOF OF SERVICE OF DOCUMENT

I am over the age of 18 and not a party to this bankruptcy case or adversary proceeding. My business address is: 20969 Ventura Blvd., Ste. 230, Woodland Hills, CA 91364.

A true and correct copy of the foregoing document described as **DEBTOR'S OPPOSITION TO MOTION FOR RELIEF FROM STAY** will be served or was served **(a)** on the judge in chambers in the form and manner required by LBR 5005-2(d); and **(b)** in the manner indicated below:

I. **TO BE SERVED BY THE COURT VIA NOTICE OF ELECTRONIC FILING ("NEF")** – Pursuant to controlling General Order(s) and Local Bankruptcy Rule(s) ("LBR"), the foregoing document will be served by the court via NEF and hyperlink to the document. On *6/20/2011,* I checked the CM/ECF docket for this bankruptcy case or adversary proceeding and determined that the following person(s) are on the Electronic Mail Notice List to receive NEF transmission at the email address(es) indicated below:

- **John P Byrne**    John.Byrne@byrnelaw.biz
- **John J Menchaca (TR)**    igaeta@menchacacpa.com,
  ca87@ecfcbis.com;igaeta@menchacacpa.com
- **United States Trustee (LA)**    ustpregion16.la.ecf@usdoj.gov

☐    Service information continued on attached page

II. **SERVED BY U.S. MAIL OR OVERNIGHT MAIL**(indicate method for each person or entity served):
On *Fill in Date Document is Filed,* I served the following person(s) and/or entity(ies) at the last known address(es) in this bankruptcy case or adversary proceeding by placing a true and correct copy thereof in a sealed envelope in the United States Mail, first class, postage prepaid, and/or with an overnight mail service addressed as follows. Listing the judge here constitutes a declaration that mailing to the judge will be completed no later than 24 hours after the document is filed.

☐    Service information continued on attached page

III. **SERVED BY PERSONAL DELIVERY, FACSIMILE TRANSMISSION OR EMAIL** (indicate method for each person or entity served): Pursuant to F.R.Civ.P. 5 and/or controlling LBR, on *6/20/11,* I served the following person(s) and/or entity(ies) by personal delivery, or (for those who consented in writing to such service method), by facsimile transmission and/or email as follows. Listing the judge here constitutes a declaration that personal delivery on the judge will be completed no later than 24 hours after the document is filed.

Movant's Attorney:  William Schneberg [schneberglaw@yahoo.com]

☐    Service information continued on attached page

I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

| 6/20/11 Patricia Recinos | | /Patricia Recinos/ |
|---|---|---|
| *Date* | *Type Name* | *Signature* |

This form is mandatory.  It has been approved for use by the United States Bankruptcy Court for the Central District of California.

*August 2010*                                                                **F 9013-3.1.PROOF.SERVICE**